11th
Court of Appeals

                                                                  Eastland,
Texas

                                                                        Opinion

C.K. Oil Properties, Inc. and

Rocker A Operating Company

 

Appellants

 

Vs.                   No.
11-99-00066-CV B Appeal from Scurry County

 

Hrubetz Operating Company

 

Appellee

 

This appeal involves
a dispute regarding the operation of a group of oil and gas leases located in
Scurry County which we will refer to as the “Corazon leases.”  The Corazon leases were the subject of a
1987 written agreement referred to as the ACorazon Acquisition Participation
Agreement.@  The record reflects
that oil had been produced from the Corazon leases from approximately 150 wells
for several years prior to 1987.  In the
mid-1980s, Hrubetz Operating Company (HOPCO) and Kerr-McGee Corporation
(Kerr-McGee) identified the Corazon leases as a prospect for the implementation
of secondary recovery operations through the installation of a waterflood
program.  They executed the
participation agreement to govern the manner and means by which the Corazon
leases would be acquired and operated.

The participation agreement provided that
Kerr-McGee would obtain 100 percent of the present leasehold interest of the
Corazon leases in consideration of Kerr-McGee paying 100 percent of the cost of
acquiring and operating the leases, including the cost of installing the
waterflood program.[1]  The participation agreement further provided
that HOPCO would serve as the operator of the Corazon leases until an agreed
level of payout had occurred. 
Kerr-McGee was, therefore, not at liberty to terminate HOPCO as the
operator of the Corazon leases prior to payout even though Kerr-McGee owned all
of the present leasehold interest in the leases.  








As of 1992, Kerr-McGee had expended in excess of
$17,000,000 in acquiring the Corazon leases and installing the waterflood
program under the participation agreement.  
However, the waterflood had not resulted in any measurable increase in
production.  Kerr-McGee deemed the
waterflood program a failure at that point and instructed HOPCO to suspend the
waterflood program.  Kerr-McGee
additionally instructed HOPCO to reduce the number of wells being operated on
the Corazon leases to less than 20. 
HOPCO operated the Corazon leases on this limited basis as per the
instructions of Kerr-McGee from 1992 until 1997.

Kerr-McGee conveyed its interests in the Corazon
leases to C.K. Oil Properties, Inc. (C.K.) in November 1997 for $700,000.  Immediately upon its acquisition of the
Corazon leases, C.K. forwarded a letter dated November 6, 1997, to HOPCO which
informed HOPCO that it was terminated as operator effective December 1,
1997.  The letter instructed HOPCO to
turn over all lease equipment and data to Rocker A Operating Company (Rocker
A), the successor operator designated by C.K.[2]  The letter further advised HOPCO that C.K.
would not reimburse HOPCO for any operating expenses incurred after November
10, 1997.  

C.K. took the position that, as the owner of the
working interest, it had the right to terminate HOPCO as the operator of the
Corazon leases.  C.K. further alleged
that, even if the termination of HOPCO constituted a breach of the
participation agreement, HOPCO’s only remedy was to bring a suit for
damages.  HOPCO took the position that
it could not be terminated under the terms of the participation agreement prior
to payout and that it was, therefore, not required to surrender operations of
the Corazon leases as a result of the termination.  HOPCO, thus, continued to operate the leases until trial.








Approximately one year passed from HOPCO’s receipt
of the termination letter until the controversy was tried on the merits. This
one-year period was marked by a great deal of turmoil and conflict between the
parties.   HOPCO and Rocker A each
attempted to operate the Corazon leases at various times to the exclusion of
the other.  Locks were frequently cut
and replaced in the late evening and early morning hours as each party
attempted to exclude the other from operating the leases.  

HOPCO initiated this litigation by seeking
injunctive relief which requested the trial court to specifically enforce the
terms of the participation agreement by declaring the attempted termination of
HOPCO void.[3]  HOPCO subsequently amended its pleadings to
seek damages from C.K. and Rocker A as a result of the attempted
termination.  These damages included
expenses for operating the Corazon leases from the date of termination through
the date of trial and damages which HOPCO asserted it would incur in the
future.   

C.K. and Rocker A asserted numerous defenses,
claiming that the operator provisions of the participation agreement were no
longer binding.   Two of these defensive
theories were presented to the jury.  
The first defense consisted of a claim that the participation agreement
was no longer in effect under a  “frustration
of purpose” theory.  C.K. and Rocker A
asserted that the purpose of the participation agreement was the successful
installation of the waterflood program and that this purpose had failed.   The second defense was based on a provision
in the participation agreement which required HOPCO to conduct operations on
the Corazon leases in a good and workmanlike manner.[4]  C.K. and Rocker A alleged that HOPCO had
failed to meet this standard in its operation of the leases. 








C.K. and Rocker A also asserted counterclaims
against HOPCO for trespass, conversion, 
tortious interference with a contract, and usury.   The trespass and conversion claims were
premised on HOPCO’s refusal to surrender control of the leases after the
attempted termination.  C.K. and Rocker
A alleged that HOPCO’s refusal to surrender the leases tortiously interfered
with contracts  executed between
themselves and with third parties.   HOPCO
relied on the provisions of the participation agreement and its ownership
interests in the leases to defend these claims.   The usury claim involved additional charges assessed by HOPCO as
a result of C.K.’s failure to timely pay HOPCO’s invoices for the lease
operating expenses.   HOPCO alleged that
the additional charges did not constitute the charging of interest and was,
therefore, not subject to the usury statutes.

Significant matters were resolved by summary
judgment prior to trial.  The trial court
denied HOPCO’s request to obtain the remedy of specific performance of the
contract.    The trial court also denied
C.K. and Rocker A’s usury claim.   The
remaining issues were tried to a jury. 
C.K. and Rocker A did not prevail on the two defensive theories which
were presented to the jury in defense of HOPCO’s termination.  First, the jury’s answers were not such that
they would have supported  a finding
that the participation agreement was no longer effective under a “frustration
of purpose” theory.  Secondly, the jury
found that HOPCO had operated the Corazon leases in a good and workmanlike
manner at all relevant times.   C.K. and
Rocker A have not appealed the denial of these defensive claims.  The jury returned a verdict in favor of
HOPCO for damages incurred as a result of the breach of the participation
agreement in the amount of $1,242,240.95. 
The trial court’s judgment reduced the damages awarded to HOPCO to
$680,356.95.  With respect to C.K. and
Rocker A’s claims for affirmative relief, the jury ruled that HOPCO did not
commit trespass or conversion.   The
jury found that HOPCO had interfered with the contracts cited by C.K. and
Rocker A.  However, the jury determined
that HOPCO’s interference was justified.   
Finally, the trial court’s judgment provides as follows regarding HOPCO’s
termination as operator:

It
is, therefore, ORDERED, ADJUDGED, AND DECREED that, effective December 1, 1997,
[HOPCO] was terminated as the operator of the properties described on Exhibit A
attached hereto (The ASubject Properties@). 
From and after December 1, 1998, [HOPCO] has no right to continue to
operate or otherwise occupy the Subject Properties....It is further ORDERED,
ADJUDGED AND DECREED that [C.K.’s] termination of [HOPCO] as operator of the
Subject Properties effective December 1, 1997 was a breach of the
[participation agreement].

 








C.K. and Rocker A complain of the following
matters on appeal:  (1) the summary
judgment denying their usury claim; (2) the jury’s denial of their claims for affirmative
relief; and (3) most of the damages awarded to HOPCO for breach of the
participation agreement.   HOPCO attacks
the trial court’s reduction of the damages awarded by the jury.  We affirm in part, modify in part, and
reverse and remand in part.

                                                                        USURY

C.K.’s Appellate Issues Nos. 1.1, 1.2, 1.3, and
1.4 address its usury claim.  The usury
claim is premised on additional charges purportedly assessed by HOPCO for C.K.’s
refusal to pay the monthly operating expenses for the Corazon leases after
November 1997.  HOPCO asserted that the
participation agreement permitted it to assess a 400 percent Anon-consent
penalty@ for each monthly billing which was more than 60 days past due.[5]    Both C.K. and HOPCO  filed motions for partial summary judgment
addressing HOPCO’s liability for usury. 
The trial court denied C.K.’s motion and granted HOPCO’s motion and,
thereby, denied C.K.’s usury claim.

When both sides move for summary judgment and the
trial court grants one motion and denies the other, the reviewing court should
review the summary judgment evidence presented by both sides and determine all
questions presented.  Commissioners
Court of Titus County v. Agan, 940 S.W.2d 77, 81 (Tex.1997); Jones v. Strauss,
745 S.W.2d 898, 900 (Tex.1988).  The
reviewing court should render such judgment as the trial court should have
rendered.  Commissioners Court of Titus
County v. Agan, supra at 81.  When
reviewing a traditional motion for summary judgment, the following standards
apply:  (1) the movant for summary
judgment has the burden of showing that there is no genuine issue of material
fact and that it is entitled to judgment as a matter of law; (2) in deciding
whether there is a disputed material fact issue precluding summary judgment,
evidence favorable to the non-movant will be taken as true; and (3) every
reasonable inference must be indulged in favor of the non-movant and any doubts
resolved in its favor. TEX.R.CIV.P. 166a; Goswami v. Metropolitan Savings and
Loan Association, 751 S.W.2d 487, 491 (Tex.1988); Nixon v. Mr. Property
Management Company, Inc., 690 S.W.2d 546, 548-49 (Tex.1985); City of Houston v.
Clear Creek Basin Authority, 589 S.W.2d 671, 676 (Tex.1979). 








Both C.K. and HOPCO devote a portion of their
briefs to the question of whether or not the participation agreement authorized
the assessment of the non-consent penalty for the untimely payment of joint
interest billings.  We do not address
this question because it is not necessary for the resolution of this appeal.[6]   However, it is significant to note the
contractual basis upon which HOPCO relies in assessing the non-consent
penalty.  Most oil and gas operating
agreements contain provisions which govern new projects undertaken on the
operating agreement’s contract area. 
The performance of a new project can be problematic because all of the
working interests owners may not desire to participate in it.  Operating agreements typically include
provisions which provide that, in the event a project is undertaken without the
consent of all parties, the non-consenting parties do not receive any benefits
that the new project may generate until a specified percentage of profit is
derived from the new project.  These provisions
are known as non-consent penalties because the non-consenting parties are
penalized for not participating in the new project.  In actuality, these provisions are designed to compensate the
financial risks that the consenting parties who finance the new project are
subject to, considering the ultimate possibility that the new project may be
unsuccessful.  Hamilton v. Texas Oil
& Gas Corp., 648 S.W.2d 316, 321 (Tex.App. - El Paso 1982, writ ref’d
n.r.e.).  HOPCO contends that the
provisions of the participation agreement permitted it to assess the
non-consent penalty typically assessed with regard to new projects to C.K.’s
untimely payment of the leases’ operating expenses.

We first address the trial court’s order holding
that HOPCO’s assessment of the non-consent penalty was not subject to the usury
statutes.   A person who contracts for,
charges, or receives interest that is greater than the amount authorized by law
is liable to the obligor for penalties set forth in the usury statutes.   TEX. FIN. CODE ANN. ' 305.001 (Vernon Supp.
2002).  HOPCO’s motion asserted that the
usury statutes were not applicable because the assessment of the non-consent
penalty did not constitute the charging of interest with respect to a loan
transaction.  The usury statutes define “interest”
as “compensation for the use, forbearance, or detention of money.”  TEX. FIN. CODE ANN. ' 301.002(a)(4) (Vernon
Supp. 2002).  








Several courts have analyzed the meaning of the
statutory definition of “interest.”  In
Tygrett v. University Gardens Homeowners’ Association, 687 S.W.2d 481, 483
(Tex.App. - Dallas 1985, writ ref’d n.r.e.), the court defined the three
elements of interest as follows:  (1)
the “use” of money is that which is contracted for when a loan is made; (2) “forbearance”
occurs when there is debt due or to become due and when the parties agree to
extend the time of its payment; and (3) the “detention of money” arises when a
debt becomes due and the debtor has withheld payment without a new contract
giving him the right to do so.  The “use”
element is inapplicable to this case because HOPCO has not loaned any money to
C.K. in the traditional sense of a loan. 
The “forbearance” element also is not involved because HOPCO and C.K.
did not enter into an agreement permitting C.K. to extend the due date for the
payment of the monthly operating expenses.  
We, therefore, focus our attention on the “detention of money” element.  

Several cases have analyzed the assessment of a
late fee for the purpose of determining if the late fee constitutes
compensation for the detention of money. 
The first issue examined by these cases is whether or not a debt is owed
by the debtor to the party assessing the late fee.  Tygrett involved periodic charges assessed in advance by a
homeowners’ association to the individual homeowners to pay common
expenses.  When Tygrett did not timely
pay his assessments, the homeowners’ association assessed late charges.  The court held that the advance assessments
did not constitute a debt that Tygrett owed to the association because the
association did not pay any of its own money on Tygrett’s behalf.  Instead, the association was merely a
payment agent of Tygrett through which he paid his own individual debts as a
member of the association by paying his advance assessments.








Domizio v. Progressive County Mutual Insurance
Company, 54 S.W.3d 867 (Tex.App. - Austin 2001, pet’n den’d), involved an
insurance company which assessed a charge to its policyholders for the late
payment of their insurance premiums. 
The court was faced with determining whether or not the assessment of
the late charge constituted the detention of money under the definition set out
in Tygrett.   In discussing the
definition, the court in Domizio placed emphasis on the words “debt” and
“debtor.”  The court held that the
detention of money element would only be invoked if the policyholder had
detained the insurance company’s money. 
The court ultimately held that the policyholders were not debtors
detaining the insurance company’s money because there was no obligation on the
part of the policyholders to make late payments of their premiums.  If the policyholders did not make the
payments, their coverage would simply lapse. 

Employing the analysis used in Domizio, we
must determine if the operating expenses which HOPCO charged to C.K.
constituted a debt which C.K. owed to HOPCO.  
The terms of the participation agreement as well as the simple fact that
HOPCO seeks a recovery in this action from C.K. for the leases’ operating
expenses establish that the monthly operating expenses constitute a debt which
HOPCO claims C.K. owed.   A portion of
the leases’ operating expenses assessed to C.K. sought reimbursement for
expenditures which HOPCO made to third parties on C.K.’s behalf.  The remaining portion of the operating
expenses that HOPCO sought were compensation for HOPCO’s work in operating the
leases.

HOPCO argues that a detention of money has not
occurred because it did not loan any money to C.K.  While HOPCO did not loan any money to C.K. in the traditional
sense, a “detention of money” occurred by definition.  Moreover, the usury statutes define a “loan” as “an advance of
money that is made to or on behalf of an obligor, the principal amount
of which the obligor has an obligation to pay the creditor.”  TEX. FIN. CODE ANN. ' 301.002(a)(10) (Vernon
Supp. 2002). Thus, the usury statutes’ definition of a loan is broader than a
traditional loan of money from one party to another. 








The facts in this case are analogous to an open
account transaction wherein credit is extended 
by the creditor to the debtor from the date of purchase to the date of
payment.  See Potomac Leasing Company v.
Housing Authority of the City of El Paso, 743 S.W.2d 712, 713 (Tex.App. B El
Paso 1987, writ den’d).  A service
charge or finance charge assessed on an open account is generally interest
within the meaning of the usury statute. 
Windhorst v. Adcock Pipe and Supply, 547 S.W.2d 260, 260-61 (Tex.1977);
Varel Manufacturing Company v. Acetylene Oxygen Company, 990 S.W.2d 486, 492
(Tex.App. B Corpus Christi 1999, no pet’n). 
The statute covers late charges of this nature because the definition of
“interest” includes compensation for the obligor’s detention of money past the
due date.  Varel Manufacturing Company
v. Acetylene Oxygen Company, supra at 492. 
In Varel Manufacturing Company, the court held that the
assessment of a finance charge on an open account for the sale of gas was
subject to the usury statute.  In
William C. Dear & Associates, Inc. v. Plastronics, Inc., 913 S.W.2d 251
(Tex.App.- Amarillo 1996, writ den’d), the court held that a finance charge
assessed on an open account for investigatory services was subject to the usury
statute.  Varel Manufacturing Company
and William C. Dear & Associates, Inc. are examples of cases holding
that the usury statutes were applicable even though a traditional loan of money
was not made by the creditor to the debtor.

Having determined that the operating expenses
constituted a debt which C.K. owed HOPCO, we must now determine if the
non-consent penalty assessed by HOPCO constituted compensation sought for C.K.’s
withholding of payment of its debt.  See
Tygrett v. University Gardens Homeowners’ Association, supra at 483.  The leading case in this regard is First
Bank v. Tony’s Tortilla Factory, Inc., 877 S.W.2d 285 (Tex.1994).  First Bank determined whether a bank’s
insufficient funds check fee was subject to the usury statutes.  The court held that fees which are an
additional charge supported by distinctly separate and additional
consideration, other than the simple lending of money, are not interest and,
thus, do not violate the usury laws. 
First Bank v. Tony’s Tortilla Factory, Inc., supra at 287.  The court ruled that the bank’s fee was not
subject to the usury statutes because it was assessed as a processing fee for
the additional work required of bank personnel in connection with handling a
bad check.   The court cited other
examples of fees supported by separate consideration to which the usury
statutes do not apply.

The record in this cause indicates that the
non-consent penalties assessed by HOPCO were compensation for the detention of
money because the penalties were not supported by any consideration other than
C.K.’s untimely payment of its debts. 
HOPCO assessed the non-consent penalties when each invoice submitted by
HOPCO became past due by 60 days.  Had
C.K. paid the invoices within 60 days, the non-consent penalty would not have
been assessed.  








HOPCO argues that the decision in Hamilton
establishes that the non-consent penalty was supported by separate
consideration.  Hamilton involved
the assessment of a 400 percent non-consent penalty for the drilling of a new
well.  The non-consenting party against
whom the penalty was assessed argued that the penalty constituted an
unenforceable liquidated damage clause. 
Hamilton v. Texas Oil & Gas Corp., supra at 321.  The court rejected the argument by holding
that the non-consent penalty was designed to compensate the financial risks
that the consenting parties were subject to, considering the ultimate
possibility that the new well might not have been successful.  Hamilton is distinguishable from this
case because Hamilton involved the traditional use of the non-consent
penalty being applied to a new project.  
As noted by the court in Hamilton, a new project involves
speculative financial risks which the non-consent penalty is designed to
compensate.   HOPCO’s performance of
daily operations on the leases simply does not involve the financial risks
which are involved in the drilling of a new well, especially when one considers
the fact that the participation agreement granted HOPCO extensive liens on C.K.’s
leasehold interest to secure payment.

C.K.’s Appellate Issues Nos. 1.1 and 1.2
complaining of the trial court’s granting of HOPCO’s motion for summary
judgment on C.K.’s usury claim are sustained. 
The trial court’s order denying C.K.’s usury claim is reversed and
remanded to the trial court for further proceedings consistent with this
opinion.  We note that C.K.=s motion for summary
judgment sought rulings from the trial court seeking to establish all liability
elements of the usury claim.  It does
not appear that the trial court addressed these additional matters because it
determined that the usury statutes were not applicable.  C.K. offered a bill of exception at trial
which it contends established the extent of its damages for the usury claim.  C.K.=s
Appellate Issue No. 1.3 seeks the rendition of a judgment in favor of C.K. on
the usury claim both as to liability and damages.   Given the fact that the usury claim was not fully developed in
the trial court, we decline C.K.=s
request to render judgment in its favor on the usury claim.  Our holding is limited to a determination
that the non-consent penalty constituted the charging of interest under the
usury statutes.  All remaining elements
of C.K.=s usury claim
are, therefore, remanded for further proceedings in the trial court.  We do not address C.K.=s Appellate Issue No. 1.4
requesting a remand for the consideration of C.K.=s
attorney=s fees
incurred in presenting its usury claim because this issue is moot in light of
our remand of the usury issue for full consideration.

                                                                     TRESPASS

Both C.K. and Rocker A complain in several
appellate issues of the denial of their counterclaim for trespass.   The jury answered Ano@
to the following question: ADid
[HOPCO] trespass on leases held by C.K. or Rocker A?@  The
charge defined Atrespass@ as follows:








ATrespass@ means entering or causing
another to enter property without the consent or authorization, express or
implied, of the owner, and it includes any act which exceeds or passes beyond
the bounds of any rights which have been legally granted.  Consent may be found by virtue of a
pre-existing contract between the parties or a license granted by the owner of
the property to another to enter the owner=s
property for a specified purpose.  A
trespass may be committed on, beneath, or above the surface of the earth.  Every unauthorized entry upon land is a
trespass, even if no damage is done. 
One may commit a trespass irrespective of whether he thereby causes harm
to any legally protected interest of the other if he intentionally remains on
the premises after being instructed to leave.

 

 Trespass to real property occurs when a person enters another=s land without
consent.  See General Mills Restaurant,
Inc. v. Texas Wings, Inc., 12 S.W.3d 827, 833 (Tex.App. - Dallas 2000, no pet=n).  Consent is an affirmative defense to a cause
of action for trespass.  General Mills
Restaurant, Inc. v. Texas Wings, Inc., supra at 835.  There is no dispute that HOPCO entered the lands which comprised
the Corazon leases after its termination.  
Accordingly, HOPCO=s
liability for trespass is dependent upon whether its entry was with C.K. and
Rocker A=s
consent.   

C.K. and Rocker A argue that
the jury instruction should not have included an instruction regarding  consent. 
They base this argument on the contention that HOPCO failed to plead
consent as an affirmative defense.  An
affirmative defense is generally waived if it is not pleaded.  TEX.R.CIV.P. 94; Shoemake v. Fogel, Ltd.,
826 S.W.2d 933, 937 (Tex.1992).   Texas
follows a Afair notice@ standard for pleading
which looks to whether the opposing party can ascertain from the pleading the
nature and basic issues of the controversy and what testimony will be
relevant.  Horizon/CMS Healthcare
Corporation v. Auld, 34 S.W.3d 887, 896 (Tex.2000).  HOPCO asserted several affirmative defenses in its answers to
C.K. and Rocker A=s
counterclaims.  A portion of HOPCO=s affirmative defenses were
specifically directed at C.K. and Rocker A=s
trespass allegations.  These pleadings
did not use the word Aconsent.@  However, both of HOPCO=s
answers alleged that its entry and occupation of the Corazon leases were
justified as an exercise of its rights under the participation agreement and
its ownership interests in the leases. We hold that these allegations provided
fair notice to C.K. and Rocker A of HOPCO=s
intent to rely on the affirmative defense of consent and the evidence which
would be offered in connection therewith. 









C.K. and Rocker A also attack the legal and
factual sufficiency of the evidence supporting the jury=s answer of Ano@ to the trespass
issue.  C.K. and Rocker A had the burden
of proof with respect to obtaining an affirmative jury finding of
trespass.  However, the only disputed
issue pertaining to the trespass claim was the issue of consent.  As per the holding in General Mills,
the issue of consent was an affirmative defense for which HOPCO had the burden
of proof.   We, therefore, review the
jury=s finding of
consent under a no-evidence standard with respect to C.K. and Rocker A=s legal sufficiency challenge.  An appellate court will sustain a
no-evidence point of error when:  (1)
the record discloses a complete absence of evidence of a vital fact;  (2) the court is barred by rules of law or
of evidence from giving weight to the only evidence offered to prove a vital
fact;  (3) the only evidence offered to
prove a vital fact is no more than a mere scintilla; or (4) the evidence
conclusively establishes the opposite of the vital fact.  Uniroyal Goodrich Tire Company v. Martinez,
977 S.W.2d 328, 334 (Tex.1998).  Any
evidence supporting the jury's finding that is of probative value and that is
more than a scintilla is legally sufficient to uphold the finding.  Leitch v. Hornsby, 935 S.W.2d 114, 118
(Tex.1996); Burroughs Wellcome Company v. Crye, 907 S.W.2d 497, 499
(Tex.1995).  More than a scintilla of
evidence exists where the evidence supporting the finding, as a whole, rises to
a level that would enable reasonable and fair-minded people to differ in their
conclusions.  Transportation Insurance
Company v. Moriel, 879 S.W.2d 10, 25 (Tex.1994).  In determining the factual sufficiency of the evidence, we must
consider and weigh all the evidence and should set aside the verdict only if it
is so contrary to the overwhelming weight of the evidence as to be clearly wrong
and unjust.  Cain v. Bain, 709 S.W.2d
175 (Tex.1986); In re King's Estate, 244 S.W.2d 660, 661 (Tex.1951).

HOPCO=s
primary basis for establishing consent was the terms of the participation  agreement itself.  HOPCO argued that it had the right to enter the leases
irrespective of the termination because the participation agreement designated
it as operator.  HOPCO additionally
asserted that its designation as the operator of record with the Railroad
Commission of Texas through the date of trial is further evidence of consent
for its entry on the leases.  HOPCO also
relied on its ownership interests in the Corazon leases as constituting
evidence of its consent to enter the leases after termination.  The evidence established that HOPCO
possessed an overriding royalty interest in the leases and contingent future
working interests which possibly might vest in the future. 








The facts of this case present an unusual
situation when one considers the relationship between C.K.=s breach of the participation
agreement and the counterclaims sounding in tort which C.K. and Rocker A have
asserted against HOPCO.   The
participation agreement provides that HOPCO is to be the operator of the
Corazon leases until payout occurs.  The
trial court ruled that C.K.=s
termination of HOPCO constituted a breach of the participation agreement.  C.K. has not appealed this ruling.  Thus, despite the fact that its actions
constituted an uncontested breach of the participation agreement, C.K. contends
that HOPCO was required to accept its breach. 
Furthermore, C.K. argues that HOPCO is liable to C.K. and Rocker A in
tort for HOPCO=s
refusal to accept C.K.=s
breach of the participation agreement.  


With respect to the trespass cause of action, C.K.
and Rocker A contend that HOPCO cannot rely on the terms of the participation
agreement to justify its entry onto the Corazon leases.  They cite Osage Oil & Refining Co. v.
Lee Farm Oil Co., 230 S.W. 518, 522 (Tex.Civ.App. - Amarillo 1921, writ ref=d), in support of this
proposition.  The court in Osage Oil
stated as follows:

A
party, while in the performance of a contract, when served with notice of its
repudiation by the other party, cannot proceed with the performance of the
contract except it be one of which specific performance may be enforced and
increase the damages to which he would otherwise be entitled. 

 

The rule announced in Osage Oil is one which speaks to the
damages which a non-breaching party can recover for the other party=s act of repudiating a
contract.   We find that this damage
rule does not apply to affirmative claims for relief  which a repudiating party asserts against the non-breaching party
for failing to accept the breach.    








Notice of a party=s
intent to not perform under a contract does not, of itself, constitute an
automatic contract rescission. 
Greenwall Theatrical Circuit Co. v. Markowitz, 79 S.W. 1069, 1071
(Tex.1904); Griffith v. Porter, 817 S.W.2d 131, 135 (Tex.App. - Tyler 1991, no
writ).  When one party repudiates a
contract, the other party may then elect to either accept the repudiation and
bring a suit to recover damages for its breach or treat the repudiation as
inoperative and sue for damages as they accrue when the time for performance
under the contract is due.  Pollack v.
Pollack, 39 S.W.2d 853, 857 (Tex. Comm=n
App. 1931, holding approved); America=s
Favorite Chicken Company v. Samaras, 929 S.W.2d 617, 626 (Tex.App. - San
Antonio 1996, writ den=d).  If the repudiation is not accepted by the
non-repudiating party, the contract is kept alive for the benefit of both
parties.  Griffith v. Porter, supra at
135.  HOPCO was, therefore, not required
to accept C.K.=s
repudiation of the participation agreement. 
To hold otherwise would permit C.K. and Rocker A to profit from their
own wrong.  Courts have always looked
with disfavor upon a party that intentionally breaches a contract.  National Farmers Organization v. Smith, 526
S.W.2d 759 (Tex.Civ.App. - Corpus Christi 1975, no writ). Accordingly, we hold
that HOPCO was permitted to continue operations under the terms of the
participation agreement without incurring tort liability to C.K. and Rocker A. 

The participation agreement permitted HOPCO to
enter the Corazon leases for the purpose of conducting its duties as
operator.  The participation agreement,
therefore, constituted evidence of C.K. and Rocker A=s contractual consent to HOPCO=s entry on the leases.   The evidence of the terms of the
participation agreement along with HOPCO=s
refusal to accept C.K.=s
termination constituted legally and factually sufficient evidence supporting
the jury=s denial of
C.K. and Rocker A=s
trespass claim.  C.K. and Rocker A=s Appellate Issues Nos. 2.1
and 2.3 are overruled.

C.K. and Rocker A complain in Appellate Issue No.
2.2 of the evidence supporting the  jury=s denial of their trespass
claim for one of the Corazon leases which is referred to as the Patterson
lease.  They contend that the
circumstances of the Patterson lease differentiate it from the other
leases.  C.K. and Rocker A argue that
the participation agreement did not permit HOPCO to enter the Patterson lease
based on their contention that the original Patterson lease had expired.  Rocker A subsequently obtained  a new lease for the Patterson lease which
C.K. and Rocker A argue is not governed by the participation agreement.  








The issue of HOPCO=s
trespass upon the Patterson lease was separately submitted to the jury.  The jury found that HOPCO did not trespass
upon the Patterson lease.  We find that
legally and factually sufficient evidence supported the jury=s determination that HOPCO
did not commit trespass upon the Patterson lease.   Rocker A took the new Patterson lease on November 14, 1997, at a
time when Rocker A did not own an interest in the Corazon leases.  Rocker A subsequently obtained a 2 percent
interest in the Corazon leases on March 17, 1998, from C.K.  The assignment by which C.K. subsequently
assigned the 2 percent interest to Rocker A was made effective as of July 1,
1997.  As a successor-in-title to
Kerr-McGee, by and through C.K., Rocker A, thus, became subject to the terms of
the participation agreement as of July 1, 1997.  The participation agreement contained an Aarea of mutual interest@ provision which effectively placed any leases
held or taken by a party to the agreement lying within a defined geographic
area under the terms of the participation agreement.  The evidence established that the Patterson lease is located
within the defined geographic area.   The new Patterson lease was, therefore, governed by the
participation agreement.  Therefore, the
terms of the participation agreement constituted evidence of HOPCO=s consent to enter the
Patterson lease.  C.K. and Rocker A=s Appellate Issue No. 2.2
is overruled.

                                                                 CONVERSION

C.K. and Rocker A=s
Appellate Issue No. 2.4 attacks the legal and factual sufficiency of the denial
of their counterclaim for conversion. 
C.K. and Rocker A asserted that HOPCO committed conversion after HOPCO=s termination by selling the
oil produced from the Corazon leases to a different purchaser than the one
designated by C.K. and Rocker A.  The
jury found that no conversion had occurred. 
Since C.K. and Rocker A had the burden of proof on their counterclaim
for conversion, their challenge to the legal sufficiency of the evidence
supporting a judgment denying their conversion claim is a "matter of
law" challenge.  When a party
attacks the legal sufficiency of an adverse finding on an issue on which it has
the burden of proof, it must demonstrate on appeal that the evidence
establishes, as a matter of law, all vital facts in support of the issue.  Dow Chemical Co. v. Francis, 46 S.W.3d 237,
241 (Tex.2001).

 Conversion
occurs when one person makes an unauthorized and wrongful assumption and
exercise of dominion and control over the personal property of another, to the
exclusion of or inconsistent with the owner's rights.  Waisath v. Lack's Stores, Inc., 474 S.W.2d 444, 447 (Tex.1971).  However, there can be no conversion where
one takes only what he is entitled to receive. 
Enduro Oil Company v. Parish & Ellison, 834 S.W.2d 547, 549
(Tex.App. - Houston [14th Dist.] 1992, writ den=d).  If a defendant proves that he has a superior
title or is entitled to the property pursuant to an agreement, an action for
conversion cannot be maintained.  Id.  








The evidence offered at trial regarding the
conversion issue showed that, soon after C.K. and Rocker A acquired the Corazon
leases from Kerr-McGee, they retained a new crude oil purchaser to purchase the
oil produced from the leases.  Sometime
later, HOPCO retained another crude oil purchaser to purchase the oil.  The purchaser retained by HOPCO paid a lower
price for the oil than the previous purchaser retained by C.K. and Rocker A.  HOPCO asserted that it had the right to
switch oil purchasers for the same reasons that it felt it had the right to
continue operating the leases after termination.  Specifically, HOPCO relied on the operator designation contained
in the participation agreement and its designation as the operator of record
with the Railroad Commission.  The
participation agreement contained provisions which permitted HOPCO, as the
operator of the leases, to control the sale of oil produced from the Corazon
leases whenever the working interest owner did not pay the operating expenses
for the leases.  There is evidence that
C.K. refused to pay the leases=
operating expenses to HOPCO after the date of the purported termination.  The terms of the participation agreement,
therefore, permitted HOPCO=s
change of oil purchasers.  C.K. and
Rocker A=s Appellate
Issue No. 2.4 is overruled.

                                                      TORTIOUS
INTERFERENCE

C.K. and Rocker A=s
Appellate Issue No. 3.1 is directed at their claims for tortious interference
with a contract.  They allege that
HOPCO  tortiously  interfered with the new Patterson lease
which Rocker A had obtained and the operating agreement executed by C.K. and
Rocker A.  The alleged interference was
premised on HOPCO=s
refusal to surrender the Corazon leases after the attempted termination.  As stated earlier, the jury found that HOPCO
interfered with each of these contracts. 
However, the jury further found that HOPCO=s
interference with these contracts was justified.   

The supreme court has identified the elements of
tortious interference with an existing contract as follows: (1) an existing
contract subject to interference and (2) a willful and intentional act of interference
with the contract (3) that proximately caused the plaintiff=s injury and (4) caused
actual damages or loss.  Prudential
Insurance Company of America v. Financial Review Services, Inc., 29 S.W.3d 74,
77 (Tex.2000); ACS Investors, Inc. v. McLaughlin, 943 S.W.2d 426, 430
(Tex.1997).  A defendant may negate
liability on the ground that its conduct was privileged or justified.  Prudential Insurance Company of America v. Financial
Review Services, Inc., supra at 77-78; ACS Investors, Inc. v. McLaughlin, supra
at 430-31.  The justification defense
can be based on the exercise of either (1) one=s
own legal right or (2) a good-faith claim to a colorable legal right, even
though that claim ultimately proves to be mistaken.  Prudential Insurance Company of America v. Financial Review
Services, Inc., supra at 80; Texas Beef Cattle Company v. Green, 921 S.W.2d
203, 211 (Tex.1996).  








C.K. and Rocker A complain that a justification
question should not have been submitted to the jury because the evidence
conclusively negated HOPCO=s
justification defense.  They, therefore,
attack the legal sufficiency of the evidence supporting the jury=s finding of
justification.  Distilled to its
essence, C.K. and Rocker A=s
contention regarding their tortious interference claims  involves the same dynamics under which their
claims for trespass and conversion are brought.  They contend that HOPCO was not permitted to rely on the terms of
the participation agreement after termination. 
They buttress this contention with the fact that the trial court denied
HOPCO=s claim for
specific performance.  As set forth in Texas
Beef Cattle, a good-faith claim to a colorable legal right is a defense to
a tortious interference claim even if the claim ultimately proves to be
mistaken.  HOPCO=s reliance on the terms of the participation
agreement constituted evidence supporting the jury=s finding of justification.  C.K. and Rocker A=s Appellate Issue No. 3.1 is overruled.  

                                                            HOPCO=S DAMAGES

Both C.K. and HOPCO attack the trial court=s judgment regarding the
damages awarded to HOPCO as a result of C.K.=s
termination of HOPCO as operator.[7]  With respect to HOPCO=s contentions, C.K. has filed a motion to
strike HOPCO=s
appellate issues on the basis that HOPCO did not file an appellant=s brief setting forth said
issues.  Instead, HOPCO raised its
appellate complaints for the first time in its appellee=s brief. 
Our review of the record indicates that HOPCO timely filed a notice of
appeal in this matter.  Furthermore,
HOPCO paid an additional filing fee which was assessed by this court.  These acts were sufficient to invoke the
jurisdiction of this court to consider HOPCO=s
complaints regarding the trial court=s
judgment.  While it would probably be a
better practice for HOPCO to submit its complaints in an appellant=s brief filed at the outset
of the briefing phase of the appeal, we will consider HOPCO=s appellate issues.    C.K.=s
motion to strike HOPCO=s
appellate issues is overruled.  We note
in making this ruling that C.K. has submitted a reply brief in which it was
able to submit any response to HOPCO=s
appellate issues which it deemed necessary. 









Several damage elements were submitted to the jury
which sought findings from the jury of HOPCO=s
damages for various activities and time periods.  The jury answered the question regarding HOPCO=s damages as follows:

What sum of money, if any, if paid now in cash,
would fairly and reasonably compensate [HOPCO] for its damages, if any, that
resulted from [C.K.=s]
removal of [HOPCO] as operator?

 

Consider the following elements of damages, and no
others.  Do not add any amount of
interest on damages, if any.  Answer in
dollars and cents, if any, for each of the following:

 

1.                 
Payment of indirect overhead                

charges in the past.                                           Answer
$240,000.00

 

2.                 
Payment of indirect overhead

charges in the future.                                         Answer $480,000.00

 

3.                 
Payment of Joint Interest Billings.                      Answer $160,240.76

 

4.                 
Reimbursement for third party 

operating and contractor expenses.                   Answer $  58,290.19

 

5.                 
Lost revenues from secondary 

recovery operations.                                         Answer $    None     
 

 

Upon considering C.K.=s
motion for judgment notwithstanding the verdict, the trial court lowered the
awards for the first two damage elements from $240,000.00 and $480,000.00 to
$50,946.00 and $197,880.00 respectively. 

C.K. globally attacks the damages submission on
the ground that it was not conditioned on a finding of liability.  This contention is without merit.  The jury was not asked a question as to
whether or not C.K.=s
termination of HOPCO constituted a breach of contract.  However, this question was unnecessary
because the trial court ruled as a matter of law that C.K.=s termination of HOPCO
constituted a breach of the participation agreement.   Furthermore, C.K. has not challenged this ruling on appeal.  Thus, the only disputed question regarding HOPCO=s breach of contract claim
was the damages to which it was entitled. 
C.K.=s
Appellate Issue No. 4.3 is overruled.

 








                                                      Past
Indirect Overhead Charges

C.K.’s Appellate Issue No. 4.1 attacks the legal
and factual sufficiency of the evidence supporting the damages awarded for past
and future indirect overhead charges. 
The term “indirect overhead charge” represents a monthly per well charge
which HOPCO was entitled to collect for each well it operated on the Corazon
leases.  The indirect overhead charge
was an amount which HOPCO was entitled to collect in addition to its actual
costs in operating the leases.  In
essence, the indirect overhead charge represented the profit HOPCO was entitled
to receive in operating the Corazon leases under the terms of the participation
agreement.  With respect to the indirect
overhead charges at issue in this appeal, there are three amounts which must be
multiplied together to determine the total charges for a given period of
time:  (1) the monthly per well indirect
overhead charge; (2) the number of wells being operated each month; and (3) the
number of months in the calculation period.

In connection with the first damage element regarding
past indirect overhead charges, the record reflects that HOPCO sought a
recovery for indirect overhead charges which accrued during the months of July
1998 through November 1998 (the date of trial).[8]   HOPCO offered an exhibit which was
specifically directed to the past indirect overhead charges element.  This exhibit calculated the amount which
HOPCO sought to recover for past indirect overhead charges to be
$31,538.00.  This figure was calculated
by multiplying the monthly per well indirect overhead charge of $485.20 x 13
wells x 5 months.[9]  The jury awarded $240,000.00 for this damage
element.  The trial court reduced the
jury’s award to $50,946.00.  C.K. argues
that the evidence conclusively established the amount of damages for this
element to be $31,538.00.  HOPCO argues
that the trial court erred in reducing the jury’s answer of $240,000.00 to
$50,946.00.  








A trial court may render a judgment
notwithstanding the verdict if a directed verdict would have been proper and
may, upon notice and motion, disregard any jury finding on a question that has
no support in the evidence.  See
TEX.R.CIV.P. 301; Mitchell v. LaFlamme, 60 S.W.3d 123, 127 (Tex.App. - Houston
[14th Dist.] 2000, no pet’n).   An
appellate court will affirm a judgment notwithstanding the verdict if there is
no evidence to support an issue or, conversely, if the evidence establishes an
issue as a matter of law.  See Exxon
Corporation v. Quinn, 726 S.W.2d 17, 19 (Tex.1987); Mitchell v. LaFlamme, supra
at 127.  We agree with C.K.’s contention
that the evidence conclusively established the amount of past indirect overhead
charges to be $31,538.00.   The
above-mentioned exhibit was specifically tailored to this damage element.  There is no evidence of HOPCO operating any
additional wells during this five-month period of time.  Accordingly, C.K.’s complaint regarding the
judgment awarding past indirect overhead charges of $50,946.00 is
sustained.  HOPCO’s Appellate Issue No.
4.2(a) seeking the full recovery of the jury’s award of $240,000.00 is
overruled because the evidence conclusively established the amount of
$31,538.00 in damages for the first element. 

                                                    Future
Indirect Overhead Charges

C.K. next complains of the judgment’s award for
the second damage element regarding 
future indirect overhead charges.  
The record reflects that this damage element was intended to compensate
indirect overhead charges which would occur after the date of trial (November
1998).  The jury awarded $480,000.00 for
this damage element.  The trial court
reduced the jury’s award to $197,880.00. 
C.K. attacks the legal and factual sufficiency of the evidence
supporting the recovery of any damages for this element.  HOPCO argues that the trial court erred in
reducing the jury=s answer of $480,000.00 to $197,880.00.  








Given the fact that C.K.’s termination of HOPCO
constituted a breach of the participation agreement, HOPCO was entitled to
recover as damages the present value of payments of future indirect overhead
charges that it would have received had C.K. abided by the terms of the participation
agreement.  See Pollack v. Pollack,
supra at 857.  C.K. argues that HOPCO’s
recovery of future indirect overheard charges is tantamount to a recovery of
lost profits.  Consequently, C.K.
contends that the rather strict evidentiary requirements for obtaining a
recovery for lost profits apply to this case. 
See Holt Atherton Industries, Inc. v. Heine, 835 S.W.2d 80
(Tex.1992).  While the indirect overhead
charges represented the profit which HOPCO was entitled to receive for the
services it performed under the participation agreement, we do not agree that
the rules for obtaining a recovery for lost profits apply to this case.  A 
recovery for lost profits in the typical case is dependent upon
fluctuating market conditions which require careful scrutiny in order to
overcome concerns of a speculative recovery. 
In this case, however, the amount of profit (i.e. the indirect overhead
charge) which HOPCO was entitled to receive was expressly set out in the
contract.   

The recovery of future indirect overhead charges
in this case is analogous to the damages at issue in Kiewit Texas Mining
Company v. Inglish, 865 S.W.2d 240 (Tex.App. - Waco 1993, writ den’d).  Kiewit involved a claim for the
recovery of future royalties under a coal lease which had been wrongfully
repudiated.   The amount of each of the
future royalties in Kiewit was contractually established by the lease as
is the case with the amount of the indirect overhead charges being established
by the participation agreement.  Citing
WILLISTON ON CONTRACTS '1397 (Baker Voorhis, 3rd ed. 1968), the court held that
the claimants were entitled to the value of the expected performance of the
contract which is to be calculated by estimating the probability of future
performance.  Kiewit Texas Mining
Company v. Inglish, supra at 245.  








The receipt of future royalties in Kiewit
depended upon a single variable, that being the period of time in which the
lease would remain in force in the future. 
The amount of future indirect overhead charges to which HOPCO is
entitled depends on two variables:  (1)
the number of wells which would be operated in the future and (2) the length of
time in which the Corazon leases would remain in force in the future.  With respect to the number of wells to be
operated, the evidence showed that both Kerr-McGee and C.K. limited the number
of wells to be operated by HOPCO to less than 20.  However, the evidence also showed that C.K. brought several
additional wells into operation after its purchase, raising the total number of
wells operated on the Corazon leases to over 50.  As for the future existence of the Corazon leases, there was
evidence that the leases had been in existence for several years.  Testimony was also offered to the effect
that several million barrels of oil reserves remained in place.   This evidence constituted objective data
upon which the jury could draw a reasonable conclusion based upon a reasonable
certainty.   We, therefore, find that
some evidence was offered as to the future indirect overhead charges to which
HOPCO would be entitled had C.K. not breached the participation agreement.   C.K.’s challenge to the legal sufficiency
of the evidence supporting a recovery for future indirect overhead charges is
overruled.  

We next address C.K.’s complaint regarding the
factual sufficiency of the evidence supporting the jury’s finding of future
indirect overhead charges in the amount of $480,000.00.  The record is devoid of any attempt by the
parties to offer evidence regarding the present value of the future indirect
overhead charges which HOPCO would be entitled to receive.  Furthermore, the jury charge did not request
the jury to limit its answer to present value. 
We, therefore, find that the evidence is factually insufficient to
support the jury’s finding of $480,000.00. 
C.K.’s factual sufficiency complaint is, therefore, sustained.  The question pertaining to the amount of
future indirect overhead charges to which HOPCO is entitled is remanded to the
trial court for determination consistent with this opinion.  We do not address HOPCO’s appellate issues
attacking the trial court’s refusal to enter judgment in the amount of
$480,000.00 because the jury’s answer was not supported by factually sufficient
evidence.    

                                           Joint
Interest Billings and Third-Party Expenses

C.K.’s Appellate Issue No. 4.2  attacks HOPCO’s recovery under the jury’s
answers for the third and fourth damage elements.  The third damage element sought the payment of joint interest
billings.  The term “joint interest
billing” is a term commonly used in the oil and gas industry to refer to a
statement periodically submitted by the operator to the working interest owners
to obtain payment of their proportionate share of a lease’s operating
expenses.   In this case, the third
damage element sought the recovery of all operating expenses incurred in the
production of the leases from December 1997 through June 1998.  As set forth in Footnote No. 8 above, the
third damage element included future indirect overhead charges for the months
of December 1997 through June 1998.  The
remainder of the charges sought by the third damage element consisted of other
expenses  purportedly incurred by HOPCO
in operating the leases from December 1997 through June 1998.  The fourth damage element sought
reimbursement for the third-party operating and contractor expenses incurred by
HOPCO from July 1998 to November 1998.[10]








Citing the previously-quoted ruling of Osage
Oil, C.K. argues that HOPCO was not entitled to recover any damages for
expenses it incurred in actually operating the leases after the date of the
purported termination.[11]   As stated by the court in Osage Oil:

A
party, while in the performance of a contract, when served with notice of its
repudiation by the other party, cannot proceed with the performance of the
contract except it be one of which specific performance may be enforced and
increase the damages to which he would otherwise be entitled. 

 

Osage Oil & Refining Co. v. Lee Farm Oil Co., supra at
522.   C.K. is essentially arguing that
HOPCO failed to mitigate its damages as a matter of law under Osage Oil
by continuing to perform under the contract after the purported
termination.  The record reveals that,
while HOPCO sought a recovery for specific performance at various points in
these proceedings, the trial court denied this requested relief by granting partial
summary judgment.[12]        For
the same reasons that we have rejected the ruling in Osage Oil as
serving as a basis for C.K.’s and Rocker A’s counterclaims sounding in tort, we
do not find Osage Oil to be controlling on the issue of HOPCO’s
damages.   As noted previously, a
non-breaching party has the option of treating a repudiation of contract as
inoperative.  See America’s Favorite
Chicken Company v. Samaras, supra at 626. 
If the repudiation is not accepted by the non-repudiating party, the
contract is kept alive for the benefit of both parties.  See Griffith v. Porter, supra at 135.  Because the ruling in Osage Oil
directly conflicts with the non-breaching party’s option of treating the
repudiation as inoperative, we decline to apply Osage Oil to the facts
of this case.  We hold that HOPCO was
permitted to treat the purported termination as inoperative and, thereby,
continue performing under the contract at least until the matter was
litigated.   C.K.’s Appellate Issue No.
4.2 is overruled.

                                                Remand
of HOPCO’s Damage Awards








In summary, we have determined the amounts which
the evidence established as HOPCO’s damages for C.K.’s breach of the participation
agreement.  However, we are unable to
render judgment in HOPCO’s favor for these amounts because of our remand of the
usury claim.  The usury statutes contain
a provision whereby the principal amount of the debt upon which usurious
interest is charged is forfeited if the rate of interest charges is greater
than twice the amount of interest authorized by the usury statutes.  TEX. FIN. CODE ANN. ' 305.002 (Vernon Supp
2002)[13];
see Steves Sash & Door Company, Inc. v. Ceco Corporation, 751 S.W.2d 473
(Tex.1988).   A penalty at the rate of
400 percent would obviously be greater than twice the maximum interest
rate.  HOPCO would not be entitled to
recover for any damage element upon which the non-consent penalty may have been
assessed.  We, therefore, remand all
damage awards to HOPCO so that the trial court may determine which portion of
the damage elements served as the basis for the assessment of the non-consent
penalty.  HOPCO should be awarded as
damages, in the amounts set forth in this opinion, all portions of the damage
elements which did not serve as the basis for the assessment of the non-consent
penalties.  See Steves Sash & Door
Company, Inc. v. Ceco Corporation, supra at 475.

In remanding the issue of future indirect overhead
charges, we feel it necessary to define the relevant time period of our remand
order.   The jury’s answers to the
first, third, and fourth damage elements covered the damages HOPCO sought for
the period of December of 1997 through November 1998.  The issue that we are remanding concerns indirect overhead
charges which  possibly have accrued
after November 1998.  It would appear
that the remanded issue of indirect overhead charges should be submitted to the
fact finder as two separate questions. 
The first question should inquire as to the indirect overhead charges
which would have accrued after November 1998 until the date of retrial.  The second question should seek a finding of
the present value of indirect overhead charges possibly accruing after the date
of retrial.

                                                                  Attorney’s
Fees








C.K.’s Appellate Issue No. 5 attacks the trial
court’s award of attorney’s fees to HOPCO. 
The jury awarded HOPCO attorney’s fees in the amount of $303,710.00 for
preparation and trial.  The jury refused
an award of attorney’s fees for services which may be rendered in the event of
an appeal.  The trial court reduced the
jury’s award of $303,710.00 for preparation and trial to $183,000.00.  C.K. argues that HOPCO is not entitled to
recover any amount in attorney’s fees because it failed to properly segregate
its attorney’s fees with respect to claims alleged against parties which had
been non-suited and claims for which attorney’s fees are not recoverable.  HOPCO argues on appeal that the trial court
erred in reducing the amount awarded by the jury for preparation and trial. 

As a general rule, a party seeking to recover
attorney’s fees has the burden of proof to establish that he is entitled to
them.  Stewart Title Guaranty Company v.
Sterling, 822 S.W.2d 1, 10 (Tex.1991); Lesikar v. Rappeport, 33 S.W.3d 282, 317
(Tex.App. - Texarkana 2000, pet’n den’d). 
When a plaintiff seeks to recover attorney’s fees in a case in which he
asserts multiple claims, at least one of which supports an award of attorney’s
fees and at least one of which does not, or asserts claims against multiple
defendants, he must offer evidence segregating attorney’s fees among his
various claims.  Stewart Title Guaranty
Company v. Sterling, supra at 10-11; Lesikar v. Rappeport, supra at 317.  An exception to this duty to segregate
arises when the attorney’s fees rendered are in connection with claims arising
out of the same transaction and are so interrelated that their prosecution or
defense entails proof or denial of essentially the same facts.  Stewart Title Guaranty Company v. Sterling,
supra at 11.

Our remand of the usury claim requires a remand of
the issue of HOPCO’s attorney’s fees. 
HOPCO was entitled to recover its attorney’s fees with respect to its
breach of contract claims under the terms of the participation agreement and
TEX. CIV. PRAC. & REM. CODE ANN. ' 38.001 (Vernon 1997) to the extent that
it prevailed in the trial court.   As
noted above, the trial court may determine that HOPCO is not entitled to
recover a portion of the damages it was awarded as a result of a usury
violation.  To the extent that a portion
of HOPCO’s breach of contract damages are forfeited, it cannot be a prevailing
party with respect to its claim for attorney’s fees.  See Broady v. Johnson, 763 S.W.2d 832, 835 (Tex.App. B Texarkana
1988, no writ).  No evidence of attorney’s
fees was offered to distinguish between HOPCO=s successful and unsuccessful
breach of contract claims.  We,
therefore, remand HOPCO’s entire attorney’s fee award for consideration under
the rules set out in Stewart Title Guaranty Company v. Sterling.  

 








                                                         THIS
COURT’S RULING

The judgment of the trial court insofar as it
denies C.K. Oil Properties, Inc.’s usury claim is reversed, and that cause of
action is remanded.  In light of the
remand of the usury cause of action, the issue of recovery for damages and for
attorney’s fees is returned to the trial court for further consideration.  The actual award for future indirect damages
is also reversed, and that issue is remanded. 
The actual amount of past indirect overhead charges stated in the trial
court’s judgment is modified to reflect the amount of $31,538.00 as supported
by the record.  In all other matters,
the judgment of the trial court is affirmed.

 

W. G. ARNOT, III

CHIEF JUSTICE

 

April 25, 2002

Do not
publish.  See TEX.R.APP.P. 47.3(b).                            

Panel
consists of: Arnot, C.J., and

Wright,
J., and McCall, J.

 

 

     [1]The participation agreement also provided a mechanism
by which HOPCO would obtain a portion of the leasehold interest in the future
upon various levels of payout being realized from the Corazon leases.  

     2The record indicates that Earl
Chapman is the principal stockholder and president of Rocker A.   Chapman is also the president of C.K.  

     3HOPCO sought injunctive relief on
several occasions during the pendency of this matter seeking an order declaring
that it had the exclusive right to operate the Corazon leases.  Each of these requests were denied.  The record does not reveal any requests for
injunctive relief by C.K. and Rocker A to have the trial court exclude HOPCO
from the leases during the pendency of the suit.  C.K. and Rocker A sought relief from the Railroad Commission of
Texas to have HOPCO removed as the operator of record with the Commission.  The Commission dismissed this relief on the
basis that the dispute should be settled by a court of competent jurisdiction. 

     [4]The participation agreement incorporated by reference a
form operating agreement promulgated by the American Association of Petroleum
Landmen referred to as the A.A.P.L. Form 610-1982 Model Form Operating
Agreement.  It should be noted, however,
that the operating agreement was so significantly modified by the parties that
it should not be considered a standard operating agreement.

     [5]HOPCO contends that the following provision permitted
the assessment of a 400 percent non-consent penalty for untimely payment: AIf any party fails or is unable to pay its share of
expenses within sixty (60) days after rendition of a statement therefor by
Operator...*the defaulting party=s interest shall be subject to the non-consent penalties set forth in
Article XV.B.@  The underlined
portion of the foregoing provision was added 
by the parties to the form language of the operating agreement.  In addition to the 400 percent non-consent
penalty, HOPCO also charged interest on the unpaid invoices at the rate of 12.5
percent per annum.

     [6]The trial court ultimately held that the participation
agreement did not permit HOPCO to assess the charge.

     [7]The trial court entered a directed verdict in favor of
Rocker A regarding all damages sought by HOPCO against Rocker A.  HOPCO does not challenge this ruling.

     [8]The indirect overhead charges for the months of
December 1997 (the date of termination) through June 1998 were included in the
third damage element seeking a recovery for joint interest billings.

     [9]The amount of $485.20 was set out in the participation
agreement.  The 13 wells were the number
of wells which C.K. instructed HOPCO to operate during the pendency of this
action.  The 5 months represent the
months of July 1998 through November 1998. 


     [10]To recap, the third damage element regarding the
payment of joint interest billings concerned all charges sought  by HOPCO for operating the Corazon leases,
including indirect overhead charges, for the months of December 1997 through
June 1998.  Two separate damage elements
pertained to the charges HOPCO sought for the months of July 1998 through
November 1998 (date of trial): (1) the first damage element sought indirect
overhead charges for July 1998 through November 1998 and (2) the fourth damage
element sought all other charges incurred by HOPCO from July 1998 through
November 1998.  The second damage
element involved all sums which HOPCO sought to recover for damages to be
incurred after the date of trial (November 1998).   

    [11]C.K. does not attack the amounts found by the jury for
the third and fourth damage elements.

   [12]HOPCO
did not expressly seek the remedy of specific performance at one point in these
proceedings.  C.K.  and Rocker A filed a motion for summary
judgment seeking to deny HOPCO=s original
request for specific performance.   When
the motion for summary judgment came up for consideration, HOPCO=s attorney of record announced in open court that HOPCO
was not seeking specific performance. 

    [13]TEX. FIN. CODE '
305.002 (1998) was amended effective September 1, 1999.  The amendment does not affect the usury claim
in this case because the usurious charges are alleged to have occurred prior to
September 1, 1999.

 

 

 

 

 

 

 

 











     [1]The participation agreement also provided a mechanism
by which HOPCO would obtain a portion of the leasehold interest in the future
upon various levels of payout being realized from the Corazon leases.  





     [2]The record indicates that Earl Chapman is the principal
stockholder and president of Rocker A.  
Chapman is also the president of C.K. 






     [3]HOPCO sought injunctive relief on several occasions
during the pendency of this matter seeking an order declaring that it had the
exclusive right to operate the Corazon leases. 
Each of these requests were denied. 
The record does not reveal any requests for injunctive relief by C.K.
and Rocker A to have the trial court exclude HOPCO from the leases during the
pendency of the suit.  C.K. and Rocker A
sought relief from the Railroad Commission of Texas to have HOPCO removed as
the operator of record with the Commission. 
The Commission dismissed this relief on the basis that the dispute
should be settled by a court of competent jurisdiction. 





     [4]The participation agreement incorporated by reference a
form operating agreement promulgated by the American Association of Petroleum
Landmen referred to as the A.A.P.L. Form 610-1982 Model Form Operating
Agreement.  It should be noted, however,
that the operating agreement was so significantly modified by the parties that
it should not be considered a standard operating agreement.





     [5]HOPCO contends that the following provision permitted
the assessment of a 400 percent non-consent penalty for untimely payment: AIf any party fails or is unable to pay its share of
expenses within sixty (60) days after rendition of a statement therefor by
Operator...*the defaulting party=s interest shall be subject to the non-consent penalties set forth in
Article XV.B.@  The underlined
portion of the foregoing provision was added 
by the parties to the form language of the operating agreement.  In addition to the 400 percent non-consent
penalty, HOPCO also charged interest on the unpaid invoices at the rate of 12.5
percent per annum.





     [6]The trial court ultimately held that the participation
agreement did not permit HOPCO to assess the charge.





     [7]The trial court entered a directed verdict in favor of
Rocker A regarding all damages sought by HOPCO against Rocker A.  HOPCO does not challenge this ruling.





     [8]The indirect overhead charges for the months of
December 1997 (the date of termination) through June 1998 were included in the
third damage element seeking a recovery for joint interest billings.





     [9]The amount of $485.20 was set out in the participation
agreement.  The 13 wells were the number
of wells which C.K. instructed HOPCO to operate during the pendency of this
action.  The 5 months represent the
months of July 1998 through November 1998. 






     [10]To recap, the third damage element regarding the
payment of joint interest billings concerned all charges sought  by HOPCO for operating the Corazon leases,
including indirect overhead charges, for the months of December 1997 through
June 1998.  Two separate damage elements
pertained to the charges HOPCO sought for the months of July 1998 through
November 1998 (date of trial): (1) the first damage element sought indirect
overhead charges for July 1998 through November 1998 and (2) the fourth damage
element sought all other charges incurred by HOPCO from July 1998 through
November 1998.  The second damage
element involved all sums which HOPCO sought to recover for damages to be
incurred after the date of trial (November 1998).   





     [11]C.K. does not attack the amounts found by the jury for
the third and fourth damage elements.





     [12]HOPCO did not expressly seek the remedy of specific
performance at one point in these proceedings. 
C.K.  and Rocker A filed a motion
for summary judgment seeking to deny HOPCO=s
original request for specific performance.  
When the motion for summary judgment came up for consideration, HOPCO=s attorney of record announced in open court that HOPCO
was not seeking specific performance. 





     [13]TEX. FIN. CODE '
305.002 (1998) was amended effective September 1, 1999.  The amendment does not affect the usury
claim in this case because the usurious charges are alleged to have occurred
prior to September 1, 1999.